Good morning. I just wanted to let everyone know that Judge Sykes will be participating by telephone, so there might be a slight lag and if we have any technical difficulties we'll just stop and let those be ironed out before we continue. Our first case for your honors. May it please the court, counsel. My name is Ryan Levitt. Myself along with Damon Tronis represent the appellant in this matter, Diego Pineda Sanchez. On his behalf we've raised two interrelated issues related to the district court's base offense level calculation that I submit both require this court to vacate the district court's judgment and remand for resentencing. The one I'd like to start with this morning is the issue with Carlos Parra-Pedroza, his co-defendant statement. As the court knows, the government relied upon and the district court found in the period of the conspiracy where Mr. Parra-Pedroza claimed he was working both with Pineda Sanchez and an individual named Arki, $81.3 million in laundered funds made it through Parra-Pedroza's company. Largely and most predominantly due to the fact that Parra-Pedroza estimated that he laundered more funds with Pineda Sanchez than he did with Arki, the district court held Pineda Sanchez responsible for 51% of the $81.3 million, which was $41.46 million, and added that to the base offense level calculation. We've raised a due process challenge based on the district court's necessary reliance on Parra-Pedroza's post-arrest video statement and the agent's testimony relaying its content, which was used to inflate Pineda Sanchez's base offense level. The due process inquiry, as this court knows, regarding evidence adduced at a sentence hearing focuses on the reliability of the evidence. The problem with the district court's reliance on this evidence in our estimate is that there was no way for it to make a discriminating appraisal of the probable accuracy of the post-arrest video statement, at least in a number of critical respects. There was no basis to assess or test Parra-Pedroza's unstated motives, his bias, the reason he arrested Pineda Sanchez, an individual, by the way, who did not have a criminal history or any violence in his background, while working in the midst of a sea of dangerous individuals, as money launderers and the drug trafficking world has, Parra-Pedroza certainly could have had additional, far more dangerous sources that he didn't want to give up. And one of the things the government raised in its response is that while Parra-Pedroza did, in the course of that statement, give up a number of other co-conspirators. Counsel, let me ask you, why do you say that it was necessarily his testimony? Because didn't the government find records in the context of the search warrant when they executed the search warrant from Golden Opportunities? The records, there absolutely were records that corroborated a lot of what the government said about the total amount of money laundered through this gold refinery in Florida, and that was part of the conspiracy. But what I'm taking issue with, and there's no question that Diego Pineda-Sanchez was guilty. He pled guilty. He accepted responsibility. He, in fact, laundered money. The problem is, to get to the figure that the district court got to, to broaden the scope and raise the base offense level as it did, it necessarily had to rely on Parra-Pedroza's estimate in terms of who was responsible for what. Because there were two sort of leaders, if you will, other individuals he laundered money with. According to him, one was Pineda-Sanchez and one was Arkey. And there's no records, I think, in a specific way tying Mr. Pineda-Sanchez to all these different transactions that ran through Golden Opportunities. Some were, some weren't, according to Parra-Pedroza. What number are we working on here? I'm sorry? What's the number? How many millions are we talking about here? So it was, the amount, there was a specific period of the conspiracy where 81.3 million was laundered through this refinery in Florida. And of that 81.3 million, Parra-Pedroza told agents in his post-arrest interview that I laundered more of those funds with, I only laundered funds with Mr. Pineda-Sanchez and I only laundered funds with a guy named Arkey. I did more with Pineda-Sanchez. So the government said, we think you should apply 60% of the base offense figure. The district court, still over defense objections, said, I'm going to apply 51%, which resulted in 41.46 million being added to some of the other provable figures to reach the district court's finding. It was about 60 million altogether. Wasn't there sort of a, I mean, that's a lot of money. Absolutely. Like 20 million to 63 million? About, yes. The guidelines was 25 to 65. So aren't we dealing with a number just below 63 million? Correct. And I think it was our, it's our position that that number was drastically overstated by use of this video, this post-arrest video statement at a sentencing hearing. And the fact is, I think there's any number of reasons why Mr. Parra-Pedroza would have said what he said. But the district court was aware of that and she made a finding that he was credible. Well, she made a finding that the informant was credible, who did testify live. I'm talking about Parra-Pedroza, who was a co-defendant in this case. And the recorded testimony. And so she made a finding regarding the observation, her observation of the video, which was introduced into evidence. But I think the fact remains that when we're talking about due process and what's reliable, like I said, we have no idea what's going through Parra-Pedroza's mind after he gets arrested. So are you saying that you should have been able to cross-examine? I'm saying that's one thing. I don't know that due process requires cross-examination at a sentencing hearing. What it does require is that sentences and the district court's finding with respect to the guidelines be based on reliable evidence. And there's just not enough there for us to make that determination. So I wouldn't necessarily say that cross-examination is required. I wouldn't say that at all, that it's required. It's certainly one thing that I think is appropriate. But if there's no substitute for cross-examination or something to determine the motives, the agenda, the bias, the potential fears or anxiety someone has in the course of making a post-arrest statement, then the district court is left with no other choice but to disregard or bar unreliable evidence. That's our position. So you admit, just to be sure I'm tracking your position, you say there's no dispute that there was this $61 million from Golden Opportunities and that's substantiated by the records that were turned up in the execution of the search warrant. Absolutely. But the attribution of the particular amount to your client was based on the testimony that you're challenging for the post-arrest statement. Correct. And the only thing I'd maybe quibble with is, I call it probably testimony too, but it really wasn't testimony, right? It was just a video recorded statement. One of the things we cite too that I think is worth mentioning, that I want to emphasize for this court, is its prior decision in the United States v. Palmer that we cite, where this court, it was actually a per curiam decision, and the court noted it had serious misgivings about the huge amount of narcotics piled on the defendant through a U.S. Marshal's recitation of additional narcotic sales that were used as relevant conduct in that individual sentencing hearing. That's also what happened here. The video statement was in evidence, yes, but the evidence was put forward at the sentencing hearing, largely through the testimony of the case agent, who did testify, and relayed the contents of that video and made various commentary to the district court at the sentencing hearing. Do you want to save time for rebuttal, counsel? Yes, I do. About three minutes. Okay. I'll hold off there. Thank you. Thank you. Mr. Flanagan? May it please the court. My name is Peter Flanagan. I represent the United States. The district court's $61 million calculation was a conservative figure based on multiple sources of reliable evidence. The district court began with records that were received from Golden Opportunities. That refinery kept track of the gold that was laundered through it by the defendant's conspiracy under a fictitious company name called Shopping Silver. The defendant, in his plea agreement, admitted that his conspiracy had been laundering money under that fake name since August 2011, the beginning of this conspiracy. FedEx records and agent surveillance confirmed this. They saw the members of the conspiracy sending FedEx packages under that fake name, dating back to September 2011. And the co-defendant, Mr. Parpedroza, in his post-arrest statement said the same, that he was recruited into the conspiracy by the defendant in 2011, 2010 or 2011, and the defendant came up with the idea of laundering cash, drug money, through the purchase and resale of gold. In addition, a cooperating source, Mr. Juvenal-Torres, he testified at the defendant's sentencing hearing that he began laundering money at the defendant's direction and under the fake company name Shopping Silver in August 2011. Now Refinery A records, or Golden Opportunities records, show that starting in September of that were laundered under the fake company name Shopping Silver. And while the records clearly show that Mr. Parpedroza and the defendant's conspiracy as a whole laundered that amount of money, $98.7 million, under the Shopping Silver name, the district court held the defendant responsible for only a portion of that, $61.36 million. Now this was a conservative calculation that the district court reached after making several assumptions in the defendant's favor. First and foremost, the district court credited Mr. Parpedroza's post-arrest statement in which he said, or admitted to there being a limited period of time when he was laundering money for both the defendant and an individual we're referring to here as Archie. He did identify Archie by name, but for obvious reasons he's an uninvited individual, we're not giving that name. The period that the money was laundered with both Archie and the defendant lasted from August 2011 to July of 2012. And during this time, both the defendant and the man named Archie were basically negotiating contracts to launder drug money on behalf of the cartel. Mr. Parpedroza made clear, however, that his working relationship with Archie ended in July of 2012. This turned out to be a watershed date in this case, because that's when Archie blamed Mr. Parpedroza for the seizure of about $2 million by law enforcement outside of Las Vegas, Nevada. But you need Parpedroza's testimony to show that, right? The date at which Archie is cut off depends on what Parpedroza said in his post-arrest statement? Only in part. It is in his post-arrest statement. They provide the specific dates. But Mr. Torres, the cooperating source, also testified to this event. And why it was such a watershed moment is because it prompted the defendant and Mr. Parpedroza back in sometime in late summer 2012 to fly up to Chicago and to Los Angeles to meet with an individual we've referred to in the papers as Code Conspirator LA and the cooperating source. The cartel wanted its money back. And the defendant and Mr. Parpedroza flew to meet with their U.S. representatives, who were funneling all this money into gold and back to Mexico for help in repaying the lost money. So Mr. Torres testified to that at the sentencing hearing as well. They matched. Mr. Parpedroza and Mr. Torres testified to the same date, the same amounts, the same location of the seizure. So between them, they were well corroborated. And it's two of the three individuals that were present for this Chicago meeting. So it's both that we have that from. But so basically after July of 2012, Parpedroza was laundering money exclusively with the defendant. And from that point forward, it's a total amount of about $20 million that was laundered. That's post-July 2012 conduct. I think where we're at issue is the pre-July 2012 conduct. And for that, the court assumed, again to the defendant's benefit, that none of the money that Parpedroza laundered with Archie was foreseeable to the defendant. That's not a necessary assumption that has to be made, but it was made to the defendant's benefit. Parpedroza said that Archie and the defendant knew each other and that they were friends, but one wasn't working on behalf of the other. So the court excised that amount from the $98.7 million total for the pre-July 2012 conduct and substantially reduced the amount of money for which the defendant would be held responsible. Now that said, Mr. Parpedroza did state that between the two men, he did launder more money for the defendant. But there is other evidence that showed the defendant's more pervasive involvement in this conspiracy in this pre-July 2012 time period, including the trip to Chicago. Half of the money that was seized, according to the testimony and the post-dress statement, was, belonged to the defendant, half belonged to Archie. Archie is not the one who flies up to Chicago to meet with the source and the individual helping them within Los Angeles. The defendant does. And whereas we have recorded calls in the post-cooperation period with the defendant and testimony from the cooperating source from the pre-cooperation period where it's the defendant who called him to discuss laundering money, not Archie. So the defendant is far more, from the evidence that was presented in the district court, the defendant is far more involved during this pre-July 2012 time period. It's not just Parpedroza's word. Based on that statement and this other evidence, the district court found that the defendant was responsible for only 51% of the pre-July 2012 monies. That's 51% of $81.3 million, or, as counsel said, $41.46 million. So the percentage that the district court used to calculate the pre-July 2012 conduct was the lowest possible percentage, 51%, the lowest possible percentage it could use, consistent with the evidence. I have a curious question. When they go to a pawn shop or wherever they get gold, does it all come in with a big wad of cash? The source actually testified to a funny story. Funny somehow. Funny in a certain sense. He said the first time he did this, he was with a person who brought in a suitcase full of cash. And the jewelry store owner wouldn't take the money and wanted to buy scrap gold. He said, I'm not going to take that from you. If I take that from you, then I'm going to have a long line out my door, and at the end of that line is going to be the FBI. So it was quite conspicuous. So those who were willing to sell it probably knew something was up. So all told, combining these pre- and post-July 2012 amounts, the district court held the defendant responsible for $61.36 million. The finding was based on numerous sources of evidence, including the source, Mr. Torres, and Parra-Pedroza's post-dress statement, both of whom the court observed and found to be credible, corroborated, and reliable. And just to touch on the counsel's argument regarding the district court having no basis to assess Mr. Parra-Pedroza's truthfulness, the court was able to look, put in a four or five hour long video, and observe this interview as it took place, heard the words that Mr. Parra-Pedroza spoke, in English and in Spanish, with a translation that was uncontested, an English translation that's uncontested, able to assess his mannerisms. She specifically said that she observed his demeanor and found him to be corroborated with other evidence. So we're not just talking, as far as the due process argument goes, we're not just talking about a statement, an uncorroborated, unrecorded statement that can't, of course there's no cross examination available, but the district court wasn't relying on that statement alone. It looked to other pieces of evidence. Things like that story, or that account of the $2 million seizure I mentioned, like these little bits of evidence that turn into be giant mounds of evidence that is always interrelated and corroborating each other. So there were additional reliability to assuage any due process concerns here. So in short, the sentencing court's finding on the value of the laundered funds, it was not clear error. Unless there are any questions, any additional questions for me, I respectfully ask that you affirm the defendant's conviction and sentence. Thank you, counsel. Thank you. Mr. Levitt, rebuttal. Thank you, Your Honor. I want to start with, in rebuttal, a point I respectfully think the government is trying to get away from, is that this finding and getting the base offense level to where it was, could not have happened but for Carlos Parra-Pedroza's post-arrest statement. And specifically, the specific portion of it, where he attributed more funds during this $81.3 million period to Diego Pineda-Sanchez as opposed to this individual named Archie. That's something the district court had to rely on, and specifically, in issuing its ruling, did note that she was relying on this evidence. The problem, I think, with respect to the government's argument as well, they try to establish for Your Honors that this statement was corroborated by a number of other sources of evidence. And again, I fronted for you an argument this morning, and we put in our reply brief to the fact that there's no question the government had a large amount of evidence and capable of proving Mr. Pineda-Sanchez guilty, and he, in fact, pled guilty to laundering a substantial sum of money. But the figure that the base offense level was based upon, as well as the court's consideration of 3553A1 and the nature and circumstance of the offense, was based on that testimony from Carlos Parra-Pedroza. And I just want to sort of mention, in Palmer, which we've submitted is rather analogous, there was this, as I started mentioning, this Marshall-related out-of-court statement to attribute relevant conduct to a defendant in a drug case based on other transactions. And in Palmer, it wasn't just the Marshall's testimony that the government put forward. There was evidence of the charged conduct in the form of two drug sales in May and June of 1998. There were admissions from the defendant. They actually put forward the live testimony of a buyer-turned-cooperator who described five additional narcotics transactions with the defendant. The defendant was observed carrying additional narcotics that weren't purchased by anyone on his person at the time of one of his arrests. There was a neighbor who actually testified at the sentencing hearing, at least it says in the opinion, that he saw the defendant outside for a two-year period selling narcotics every day. So even despite that- Did he say anything to anyone? Did the neighbor? Yeah. No, he was a- not that I know of, just from reading the opinion, but he did say something at the sentencing hearing and testified. For two years, that's all I'm saying. Is he cooperating with someone or just keeping it to himself? It's a three-page opinion, I'm not sure, to be honest. But he did- the government obviously located him and put his testimony forward at the sentencing hearing. So whether they approached him or he approached them, I'm not sure. But the point I'm trying to make is there was all this corroborating evidence in addition to the testimony of the marshal relating this out-of-court statement. And so to say that, well, we have all this other corroborating evidence, in the first instance, I think you can't get away from the fact that this specific- Your overtime counsel, can you wrap up quickly? Sure. That was my point, was that corroboration I don't think cures the due process issue. So with that, I'd ask this court to vacate the district court's judgment and remand for resentencing. Thank you very much. Thank you very much to both counsel.